[No. D050333. Fourth Dist., Div. One. July 31, 2008.]

COUNTY OF SAN DIEGO, Plaintiff and Appellant, v.
SAN DIEGO NORML et al., Defendants and Respondents;
WENDY CHRISTAKES et al., Interveners and Respondents.

COUNTY OF SAN BERNARDINO et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents;
WENDY CHRISTAKES et al., Interveners and Respondents.

804

COUNSEL

John J. Sansone, County Counsel, Thomas D. Bunton and C. Ellen Pilsecker, Deputy County Counsel, for Plaintiff and Appellant County of San Diego.

Ruth E. Stringer, County Counsel, Alan L. Green, Charles J. Larkin and Dennis Tilton, Deputy County Counsel, for Plaintiffs and Appellants County of San Bernardino and Gary Penrod.

American Civil Liberties Union Foundation, Adam B. Wolf, Allen Hopper; ACLU of San Diego & Imperial Counties and David Blair-Loy for Defendants and Respondents San Diego NORML, Wo/Men's Alliance for Medical Marijuana and Dr. Stephen O'Brien.

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Jonathan K. Renner and Peter A. Krause, Deputy Attorneys General, for Defendants and Respondents State of California and Sandra Shewry.

Americans for Safe Access and Joseph D. Elford for Interveners and Respondents Wendy Christakes, Norbert Litzinger, William Britt, Yvonne Westbrook and Americans for Safe Access.

OPINION

**McDONALD, Acting P. J.**—In 2003, the California Legislature enacted the Medical Marijuana Program Act. (Health & Saf. Code, §§ 11362.7–11362.9; hereafter MMP.)[1] Among other provisions, the MMP imposed on counties the obligation to implement a program permitting a limited group of persons— those who qualify for exemption from California's statutes criminalizing certain conduct with respect to marijuana (the exemptions)—to apply for and obtain an identification card verifying their exemption.

In this action, plaintiffs County of San Diego (San Diego) and County of San Bernardino (San Bernardino) contend that, because the federal Controlled Substances Act (21 U.S.C. §§ 801–904; hereafter CSA) prohibits possessing or using marijuana for any purpose, certain provisions of California's statutory scheme are unconstitutional under the supremacy clause of the United States Constitution. San Diego and San Bernardino (together Counties) did not claim below, and do not assert on appeal, that the exemption from state criminal prosecution for possession or cultivation of marijuana provided by

---

[1] All statutory references are to the Health and Safety Code unless otherwise specified.

California's Compassionate Use Act of 1996 (§ 11362.5; hereafter CUA) is unconstitutional under the preemption clause. Instead, Counties argue the MMP is invalid under preemption principles, arguing the MMP poses an obstacle to the congressional intent embodied in the CSA.

The trial court below rejected Counties' claims, concluding the MMP neither conflicted with nor posed an obstacle to the CSA. On appeal, Counties assert the trial court applied an overly narrow test for preemption, and the MMP is preempted as an obstacle to the CSA. We conclude Counties have standing to challenge only those limited provisions of the MMP that impose specific obligations on Counties, and may not broadly attack collateral provisions of California's laws that impose no obligation on or inflict any particularized injury to Counties. We further conclude, as to the limited provisions of the MMP that Counties *may* challenge, those provisions do not positively conflict with the CSA, and do not pose any added obstacle to the purposes of the CSA not inherent in the distinct provisions of the exemptions from prosecution under California's laws, and therefore those limited provisions of the MMP are not preempted. We also reject San Bernardino's claim that the identification card provisions of the MMP are invalid under the California Constitution.

I

THE STATUTORY FRAMEWORK

A. *California Law*

*The CUA*

In California, marijuana is classified as a schedule I controlled substance (see § 11054, subd. (d)(13)), and its possession is generally prohibited. However, when California voters adopted the CUA, California adopted an exemption from state law sanctions for medical users of marijuana. The CUA, codified in section 11362.5, provides:

"(b)(1) The people of the State of California hereby find and declare that the purposes of the [CUA] are as follows:

"(A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

"(B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.

"(C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana.

"(2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes.

"(c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes.

"(d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician.

"(e) For the purposes of this section, 'primary caregiver' means the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person."

*The MMP*

In 2003, the Legislature enacted the MMP to "address issues not included in the CUA." (*People v. Wright* (2006) 40 Cal.4th 81, 85 [51 Cal.Rptr.3d 80, 146 P.3d 531].) Among the MMP's purposes was to " 'facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers.' " (40 Cal.4th at p. 93.) To that end, the MMP included provisions establishing a voluntary program for the issuance of identification cards to persons qualified to claim the exemptions provided under California's medical marijuana laws. (§§ 11362.7, subd. (f), 11362.71.) Participation in the identification card program, although not mandatory, provides a significant benefit to its participants: they are not subject to arrest for violating California's laws relating to the possession, transportation, delivery or cultivation of marijuana, provided they meet the conditions outlined in the MMP. (§ 11362.71, subd. (e).)

■ Although the bulk of the provisions of the MMP confer no rights and impose no duties on counties,[2] one set of provisions under the MMP—the program for issuing identification cards to qualified patients and primary caregivers—does impose certain obligations on counties. (§ 11362.71 et seq.) Under the identification card program, the California Department of Health Services is required to establish and maintain a program under which qualified applicants may voluntarily apply for a California identification card identifying them as qualified for the exemptions; the program is also to provide law enforcement a 24-hour a day center to verify the validity of the state identification card. (§ 11362.71, subd. (a).) The MMP requires counties to provide applications to applicants, to receive and process the applications, verify the accuracy of the information contained on the applications, approve the applications of persons meeting the state qualifications and issue the state identification cards to qualified persons, and maintain the records of the program. (§§ 11362.71–11362.755.)

The identification card program is voluntary and a person need not obtain an identification card to be entitled to the exemptions provided by state law. (§ 11362.765, subd. (b); *People v. Wright, supra,* 40 Cal.4th at pp. 93–94 [the MMP applies to both cardholders and noncardholders].)

## B. *Federal Law—the CSA*

■ The CSA provides it is "unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice . . . ." (21 U.S.C. § 844(a).) The exception regarding a doctor's prescription or order does not apply to any controlled substance Congress has classified as a schedule I drug (see 21 U.S.C. § 812(c)), including marijuana. (*Gonzales v. Raich* (2005) 545 U.S. 1, 14–15 [162 L.Ed.2d 1, 125 S.Ct. 2195].) Schedule I drugs are so categorized because they have (1) a high potential for abuse,

---

[2] For example, the MMP's exemptions encompass a broad list of specified drug offenses from which qualified patients and primary caregivers would be immune. The MMP provides that exempt persons would not " 'be subject, on that sole basis, to criminal liability under Section 11357 [possession of marijuana], 11358 [cultivation of marijuana], 11359 [possession for sale], 11360 [transportation], 11366 [maintaining a place for the sale, giving away or use of marijuana], 11366.5 [making available premises for the manufacture, storage or distribution of controlled substances], or 11570 [abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance].' (§ 11362.765, subd. (a).)" (*People v. Wright, supra,* 40 Cal.4th at p. 93.) The MMP also contains definitional provisions for those entitled to the protections of the MMP (§ 11362.7), imposes obligations on applicants and holders of identification cards (§§ 11362.715, 11362.76, 11362.77, 11362.81), and contains several other miscellaneous provisions.

(2) no currently accepted medical use in treatment in the United States, and (3) a lack of accepted safety for use under medical supervision. (21 U.S.C. § 812(b)(1).)

Possession of marijuana for personal use is a federal misdemeanor. (21 U.S.C. § 844a(a).) The legislative intent of Congress to preclude the use of marijuana for medicinal purposes is reflected in the statutory scheme of the CSA:[3] "By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study. [Citations.]" (*Gonzales v. Raich, supra*, 545 U.S. at p. 14.)

Although the use of marijuana for medical purposes has found growing acceptance among the states (*Conant v. Walters* (9th Cir. 2002) 309 F.3d 629, 643 [noting "Alaska, Arizona, Colorado, Maine, Nevada, Oregon and Washington . . . have followed California in enacting medical marijuana laws by voter initiative"]), marijuana remains generally prohibited under the CSA. (*Conant*, at p. 640; *Gonzales v. Raich, supra*, 545 U.S. at p. 15, fn. 23 [efforts to reclassify marijuana to permit medicinal uses have been unsuccessful].)

II

PROCEDURAL BACKGROUND

In 2006 San Diego filed a complaint against the State of California and Sandra Shewry, in her former capacity as Director of the California Department of Health Services (together State), as well as the San Diego chapter of the National Organization for the Reform of Marijuana Laws (NORML). San Diego's complaint alleged it had declined to comply with its obligations under the MMP and NORML had threatened to file suit against San Diego for its noncompliance. Accordingly, San Diego sought a judicial declaration that it was not required to comply with the MMP, arguing the entirety of the MMP and the CUA (except for § 11362.5, subd. (d)) was preempted by federal law. San Bernardino filed its suit raising the same preemption claims, and its complaint was subsequently consolidated with that of San Diego. The County of Merced intervened in San Diego's action and alleged, as an additional ground for relief, that the MMP was invalid because it amended the CUA in violation of article II, section 10, subdivision (c) of the

---

[3] Counties also note the United States is a party to a treaty, the Single Convention on Narcotic Drugs, March 30, 1961, 18 U.S.T. 1407, T.I.A.S. No. 6298 (see 21 U.S.C. § 801(7)), which includes prohibitions on marijuana. However, this treaty is not self-executing, and Counties do not explain how the treaty lends any added weight to the preemption questions presented here.

California Constitution.[4] Additional parties, composed of medical marijuana patients and others qualified for exemptions under the CUA and MMP, also intervened in the action.

State demurred to Counties' complaints, alleging in part that Counties did not have standing to prosecute the claims, but its demurrer was overruled. The parties subsequently filed cross-motions for judgment on the pleadings, which were consolidated for hearing in November 2006. The court ruled the CUA and MMP were not preempted by federal law and the MMP was not invalid under the California Constitution, and entered judgment accordingly. Counties appeal.

## III

### THE STANDING ISSUE

State argues on appeal that Counties do not have standing to assert the CUA and MMP are unconstitutional.[5] State's argument presents two distinct issues. The first issue is whether a political subdivision of California, charged with the ministerial obligation to enforce or carry out state laws, may ever challenge a state enactment as unconstitutional. Must the entity comply with a state law until a court has declared the law unconstitutional, or may it instead bring a declaratory relief action challenging the constitutionality of that law? The second issue, which assumes a local governmental entity *may* challenge a state law as unconstitutional, is the extent of its standing. Does the entity have standing to challenge an entire statutory scheme—including those aspects of the scheme that impose no obligations on the entity—or is it limited to challenging only those aspects that impose specific obligations on or inflict particularized injury to the local governmental entity?

### A. *General Principles*

■ A declaratory relief action requires an "actual controversy relating to the legal rights and duties of the respective parties." (Code Civ. Proc., § 1060.) Courts will decline to resolve lawsuits that do not present a justiciable controversy, and justiciability "involves the intertwined criteria of ripeness and standing." (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618].)

---

[4] County of Merced is not a party to this appeal and its complaint in intervention is not part of the record on appeal. However, we grant State's unopposed motion for judicial notice of County of Merced's complaint in intervention.

[5] The issue of standing, raised at trial, is a jurisdictional issue that may be raised at any time notwithstanding the absence of a cross-appeal. (*Citizens for Uniform Laws v. County of Contra Costa* (1991) 233 Cal.App.3d 1468, 1472 [285 Cal.Rptr. 456].)

■ "As a general principle, standing to invoke the judicial process requires an actual justiciable controversy as to which the complainant has a real interest in the ultimate adjudication *because he or she has either suffered or is about to suffer an injury of sufficient magnitude* reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator. [Citations.] To have standing, a party must be beneficially interested in the controversy; that is, he or she must have 'some special interest to be served or some particular right to be preserved or protected *over and above the interest held in common with the public at large.*' [Quoting *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].] The party must be able to demonstrate that he or she has some such beneficial interest that is concrete and actual, and not conjectural or hypothetical." (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 314–315 [109 Cal.Rptr.2d 154], italics added.)

(7) When a party asserts a statute is unconstitutional, standing is not established merely because the party has been impacted by the statutory scheme to which the assertedly unconstitutional statute belongs. Instead, the courts have stated that "[a]t a minimum, standing means a party must ' "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . ." . . . .' [Quoting *Valley Forge College v. Americans United* (1982) 454 U.S. 464, 472 [70 L.Ed.2d 700, 102 S.Ct. 752].] . . . ' "[I]t is well-settled law that the courts will not give their consideration to questions as to the constitutionality of a statute unless such consideration is necessary to the determination of a *real and vital controversy between the litigants in the particular case before it.* It is incumbent upon a party to an action or proceeding who assails a law invoked in the course thereof to show that the provisions of the statute thus assailed are applicable to him and that he is injuriously affected thereby." [Citations.]' [Quoting *Worsley v. Municipal Court* (1981) 122 Cal.App.3d 409, 418 [176 Cal.Rptr. 324].]" (*In re Tania S.* (1992) 5 Cal.App.4th 728, 736–737 [7 Cal.Rptr.2d 60].)

This court's analysis in *Tania S.* demonstrates that a party does not have standing to raise hypothetical constitutional infirmities of a statute when the statute, as applied to the party, does not occasion any injury to the party. In *Tania S.*, the appellant's children were declared dependents and removed from his custody when the court found, under Welfare and Institutions Code section 300, subdivision (b), that appellant's inability or failure to protect the children created a substantial risk of serious physical harm to them. (*In re Tania S., supra,* 5 Cal.App.4th at pp. 732–733.) The appellant did not challenge the constitutionality of the portion of section 300, subdivision (b), under which the juvenile court made its jurisdictional findings, but instead asserted a second aspect of section 300, subdivision (b) (which cautioned that an allegation of willful failure to provide adequate medical treatment based

on religious beliefs required a court to give some deference to the parent's religious practices) improperly created two classes of parents—those who injure their children out of a religious belief and those who injure their children for nonreligious reasons—making the entirety of section 300, subdivision (b), unconstitutional. (*In re Tania S.*, at pp. 735–736.) This court rejected the appellant's standing to raise the claim because the proceedings were not based on an allegation he did not provide the children adequate medical treatment or that he provided spiritual treatment through prayer. This court concluded that because the appellant "has not demonstrated he suffered any direct injury resulting from the assertedly unconstitutional portion of [the statute]," "we do not determine the substantive merits of [appellant's] claim the challenged portion of [the statute] is unconstitutional. Such determination will be made only if the claim is raised by one with standing." (*In re Tania S.*, at pp. 736–737, fn. omitted.)

## B. *Limitations on Governmental Entities*

Plaintiffs here are local governmental entities that sought in the proceedings below, and seek in this appeal, a determination that they are not obligated to comply with their duties under the statutory scheme because the statutory scheme is unconstitutional. We must evaluate the extent to which a local governmental entity of the state may attack the constitutionality of the laws it is obligated to administer.

■ As a general rule, a local governmental entity "charged with the ministerial duty of enforcing a statute . . . generally does not have the authority, in the absence of a judicial determination of unconstitutionality, to refuse to enforce the statute on the basis of the [entity's] view that it is unconstitutional." (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1082 [17 Cal.Rptr.3d 225, 95 P.3d 459], fn. omitted.) In *Lockyer*, the court rejected the entity's argument that because the entity believed certain statutes (limiting marriage to a union between a man and a woman) were unconstitutional, it could bring the issue into court by defying state law and issuing licenses to same-sex couples. *Lockyer* noted that, although there may be limited circumstances in which a public entity might refuse to enforce a statute as a means of bringing the constitutionality of the statute before a court for judicial resolution, the exception does not apply when there exists "a clear and readily available means, other than the officials' wholesale defiance of the applicable statutes, to ensure that the constitutionality of the current marriage statutes would be decided by a court." (*Id.* at p. 1099.) *Lockyer* noted that if the local officials charged with the ministerial duty of issuing marriage licenses and registering marriage certificates believed the state's current marriage statutes were unconstitutional and should be tested in court, "they could have denied a same-sex couple's

request for a marriage license and advised the couple to challenge the denial in superior court. *That* procedure—a lawsuit brought by a couple who has been denied a license under existing statutes—is the procedure that was utilized to challenge the constitutionality of California's antimiscegenation statute . . . . The city cannot plausibly claim that the desire to obtain a judicial ruling on the constitutional issue justified the wholesale defiance of the applicable statutes that occurred here." (*Lockyer*, at pp. 1098–1099, fn. and citation omitted.)

However, under some limited circumstances, a public entity threatened with injury by the allegedly unconstitutional operation of an enactment may have standing to raise the challenge in the courts. For example, in *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442 [29 Cal.Rptr.2d 103], one enactment (Sen. Bill No. 1135 (1993–1994 Reg. Sess.)) reallocated property tax revenues away from the county and to school and community college districts; while a second enactment (Sen. Bill No. 399 (1993–1994 Reg. Sess.)) affected the formulas for determining the amount of money to be applied by the state for the support of school and community college districts. (23 Cal.App.4th at pp. 1447–1448.) The court concluded the county could challenge Senate Bill No. 1135's reallocation of funds away from the county. However, the court concluded the county did not have standing to challenge Senate Bill No. 399, stating: "Without mentioning [Senate Bill No.] 399, the County alleged in its complaint that the state will use the funds reallocated pursuant to [Senate Bill No.] 1135 to fulfill its responsibilities for the financial support of schools as mandated by Proposition 98. On appeal, the County contends the 'State's action' was invalid because 'it mandated a major shift in the use of local property taxes for a specific State purpose, to fulfill the State's obligation under Proposition 98 to provide a constitutionally prescribed minimum amount of public education funding "from state revenues." ' Thus, the County seeks to challenge both [Senate Bill No.] 1135 . . . and [Senate Bill No.] 399 . . . . [¶] The constitutionality of [Senate Bill No. 399] is not before us on this appeal. This appeal deals only with the reallocation of property tax revenues from local governments and special districts to school and community college districts. The County's concern is with the loss of property tax revenue to it because of the [Senate Bill No.] 1135 reallocation. How the state treats the reallocation in connection with the mandate of California Constitution, article XVI, section 8 (Proposition 98), is of possible concern to the educational entities which are beneficiaries of the constitutional mandate, but not the County. In short, there is simply no theory based on Proposition 98 and/or the effect of [Senate Bill No.] 399 upon it, which would, even assuming there were no other obstacles, entitle the County to a writ of mandate compelling compliance with County Ordinance No. 1993-0045, and negating [Senate Bill No.] 1135. The County lacks standing to raise the issue." (23 Cal.App.4th at p. 1449.)

The other courts that have granted standing to local public entities to raise constitutional challenges to enactments they were otherwise bound to enforce have similarly done so in the limited context of enactments that imposed duties directly on or denied significant rights to the entity itself. (See, e.g., *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 5–10 [227 Cal.Rptr. 391, 719 P.2d 987] [state law provided exemption from local taxation for business inventories of foreign origin; county had standing to assert exemption violated commerce clause "because . . . the agencies experienced significant revenue loss"]; *City of Garden Grove v. Superior Court* (2007) 157 Cal.App.4th 355 [68 Cal.Rptr.3d 656] [entity asserted materials it seized from medical marijuana user could not be returned because federal preemption principles barred return of marijuana; standing to raise issue recognized because entity had specific duty at issue under the statutory scheme and issue was limited to whether that duty violated preemption principles].) However, the courts have declined to confer standing on the entity to raise constitutional challenges to enactments that had no direct impact on the entity but instead affected only the entity's constituency. (See, e.g., *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59–63 [24 Cal.Rptr.3d 72] [standing denied where enactment imposed no obligations on entity and only imposed restrictions on officials of entity].)

## C. *Analysis*

State, relying on *Lockyer v. City and County of San Francisco, supra*, 33 Cal.4th 1055, and *In re Tania S., supra*, 5 Cal.App.4th 728, argues that because Counties have suffered no cognizable injury from the exemptions for medical marijuana users provided by the MMP or CUA, the action should be dismissed because Counties' "mere dissatisfaction with . . . or disagreement with [state] policies does not constitute a justiciable controversy" and does not confer standing on Counties to raise constitutional complaints about the MMP or CUA. (*Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 662 [118 Cal.Rptr. 100].) Counties, relying on *Star-Kist Foods, Inc. v. County of Los Angeles, supra*, 42 Cal.3d 1 and *City of Garden Grove v. Superior Court, supra*, 157 Cal.App.4th 355, assert they have standing because they will suffer harm—by being required to establish and operate the apparatus to process and issue identification cards—from statutory obligations they argue are preempted by the CSA.[6]

---

[6] Counties, citing *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432 [261 Cal.Rptr. 574, 777 P.2d 610] and *Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150 [101 Cal.Rptr. 880, 496 P.2d 1248], appear also to assert that standing exists when the party has a sufficient interest in the litigation to ensure the matter will be prosecuted with vigor. However, these cases did not hold a person willing to litigate a claim intensely acquires standing that is otherwise absent, and we are not aware of any case law suggesting that a willingness to fervently pursue a cause is the sine qua non of standing to litigate that cause.

The standing principles distilled from the cases convince us Counties do not have standing to challenge those portions of the MMP and CUA that are not applicable to them and that do not injuriously affect them. (*In re Tania S., supra*, 5 Cal.App.4th at p. 737.) Accordingly, because major portions of the MMP and CUA neither impose obligations on nor inflict direct injury to Counties, we reject Counties' effort to obtain an advisory opinion declaring the *entirety* of the MMP and the bulk of the CUA invalid under preemption principles.[7] However, because limited portions of the MMP—i.e., those statutes requiring counties to adopt and operate the identification card system—*do* impose obligations on Counties, which obligations would be obviated were those statutes preempted by federal law, we conclude Counties have standing to raise preemption claims insofar as the MMP establishes the identification card system. Accordingly, we reach Counties' preemption arguments as to those statutes, and *only* those statutes, that require Counties to implement and administer the identification card system.[8]

IV

THE PREEMPTION ISSUE

A. *General Principles*

■ Principles of preemption have been articulated by numerous courts. " 'The supremacy clause of article VI of the United States Constitution grants Congress the power to preempt state law. State law that conflicts with a

---

[7] Our decision to limit Counties' constitutional challenge to those portions of the CUA and MMP that directly affect them is consonant with "[w]ell-settled principles of judicial restraint [that establish] when a case must be decided upon constitutional grounds, a court should strive to resolve the matter as narrowly as possible, and should avoid expansive constitutional pronouncements that inevitably prejudge future controversies and may have unforeseen and questionable consequences in other contexts. [Citations.]" (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 116 [40 Cal.Rptr.2d 839, 893 P.2d 1160] (conc. opn. of George, J.).) This principle of jurisprudential restraint cautions against deciding broad constitutional questions raised, as here, by persons not injuriously affected by the challenged statute. (See generally *Longval v. Workers' Comp. Appeals Bd.* (1996) 51 Cal.App.4th 792, 802 [59 Cal.Rptr.2d 463].)

[8] Specifically, we examine Counties' preemption claims only as to sections 11362.71, subdivision (b) (requiring counties to administer the identification card system established by the Department of Health Services), 11362.72 (specifying counties' obligations upon receipt of application for identification card), 11362.735 (specifying contents of identification card issued by counties), 11362.74 (specifying grounds and procedures for denying application), 11362.745 (specifying renewal procedures for cards), and 11362.755 (permitting counties to establish fees to defray cost of administering system), which impose obligations on Counties. We conclude Counties do not have standing to challenge (and therefore we do not evaluate) whether the remaining sections, and in particular sections 11362.5, subdivision (d), and 11362.765 (providing specified persons with exemptions from state law penalties for specified offenses), are preempted by the CSA.

federal statute is " 'without effect.' " [Citations.] It is equally well established that "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " [Citation.] Thus, " ' "[t]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis." [Citation.]' " (*Jevne v. Superior Court* (2005) 35 Cal.4th 935, 949 [28 Cal.Rptr.3d 685, 111 P.3d 954].)

The California Supreme court has identified "four species of federal preemption: express, conflict, obstacle, and field. [Citation.] [¶] First, express preemption arises when Congress 'define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.' [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.] Finally, field preemption, i.e., 'Congress' intent to pre-empt all state law in a particular area,' applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' [Citation.]" (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935–936 [63 Cal.Rptr.3d 50, 162 P.3d 569], fn. omitted (*Viva!*).)

The parties agree, and numerous courts have concluded, that Congress's statement in the CSA that "[n]o provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter" (21 U.S.C. § 903) demonstrates Congress intended to reject express and field preemption of state laws concerning controlled substances. (See, e.g., *People v. Boultinghouse* (2005) 134 Cal.App.4th 619, 623 [36 Cal.Rptr.3d 244] [21 U.S.C. § 903's " 'express statement by Congress that the federal drug law does *not* generally preempt state law gives the usual assumption against preemption additional force' "]; *Gonzales v. Oregon* (2006) 546 U.S. 243, 289 [163 L.Ed.2d 748, 126 S.Ct. 904] (dis. opn. of Scalia, J.) [characterizing § 903 as a "nonpre-emption clause"]; *City of Hartford v. Tucker* (1993) 225 Conn. 211 [621 A.2d 1339, 1341] [describing 21 U.S.C. § 903 and "the antipreemption provision of the Controlled Substances Act"].) When Congress has expressly described the scope of the state laws it intended to preempt, the courts "infer Congress

intended to preempt no more than that absent sound contrary evidence." (*Viva!, supra,* 41 Cal.4th at p. 945.)

### B. *Conflict and Obstacle Preemption*

Although the parties agree that neither express nor field preemption apply in this case, they dispute whether title 21 United States Code section 903 signified a congressional intent to displace only those state laws that positively conflict with the provisions of the CSA, or also signified a congressional intent to preempt any laws posing an obstacle to the fulfillment of purposes underlying the CSA.

### *Conflict Preemption*

Conflict preemption will be found when "simultaneous compliance with both state and federal directives is impossible." (*Viva!, supra,* 41 Cal.4th at p. 936.) In *Southern Blasting Services v. Wilkes County, NC* (4th Cir. 2002) 288 F.3d 584, the court construed the effect of a federal preemption clause substantively identical to title 21 United States Code section 903.[9] In rejecting the plaintiffs' argument that the local ordinances were invalid because they were in "direct and positive conflict" with the federal law, the *Southern Blasting* court concluded that "[t]he 'direct and positive conflict' language in 18 U.S.C. § 848 simply restates the principle that state law is superseded in cases of an actual conflict with federal law such that 'compliance with both federal and state regulations is a physical impossibility.' [Quoting *Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 713 [85 L.Ed.2d 714, 105 S.Ct. 2371].] Indeed, § 848 explains that in order for a direct and positive conflict to exist, the state and federal laws must be such that they 'cannot be reconciled or consistently stand together.' " (*Southern Blasting, supra,* at p. 591; accord, *Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 142–143 [10 L.Ed.2d 248, 83 S.Ct. 1210] [state law preempted where "compliance with both federal and state regulations is a physical impossibility"].)

Congress has the power to permit state laws that, although posing some obstacle to congressional goals, may be adhered to without requiring a person affirmatively to violate federal laws. (*Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 872 [146 L.Ed.2d 914, 120 S.Ct. 1913] [dicta].) In

---

[9] The preemption clause evaluated by the *Southern Blasting* court provided that, "No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together." (18 U.S.C. § 848.)

*Gonzales v. Oregon, supra,* 546 U.S. 243, the court considered whether the CSA, by regulating controlled substances and making some substances available only pursuant to a prescription by a physician "issued for a legitimate medical purpose" (21 C.F.R. § 1306.04(a) (2008)), permitted the federal government to effectively bar Oregon's doctors from prescribing drugs pursuant to Oregon's assisted suicide law by issuing a federal administrative rule (the Directive) that use of controlled substances to assist suicide is not a legitimate medical practice and dispensing or prescribing them for this purpose is unlawful under the CSA. The majority concluded the CSA's preemption clause showed Congress "explicitly contemplates a role for the States in regulating controlled substances" (*Gonzales v. Oregon,* at p. 251), including permitting the states latitude to continue their historic role of regulating medical practices. In dissent, Justice Scalia concluded title 21 United States Code section 903 was "embarrassingly inapplicable" to the majority's preemption analysis because the preemptive impact of section 903 reached only state laws that affirmatively mandated conduct violating federal laws. (*Gonzales v. Oregon, supra,* 546 U.S. at p. 289 (dis. opn. of Scalia, J.).)[10] Thus, it appears Justice Scalia's interpretation suggests a state law is preempted by a federal "positive conflict" clause, like title 21 United States Code section 903, only when the state law affirmatively requires acts violating the federal proscription.

### Obstacle Preemption

 Obstacle preemption[11] will invalidate a state law when " ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.]" (*Viva!, supra,* 41 Cal.4th at p. 936.) Under obstacle preemption, whether a state law presents "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects: [¶] 'For when the

[10] Justice Scalia explained that title 21 United States Code section 903 only "affirmatively *prescrib[ed]* federal pre-emption whenever state law creates a conflict. In any event, the Directive does not purport to pre-empt state law in any way, not even by conflict pre-emption—unless the Court is under the misimpression that some States *require* assisted suicide. The Directive merely interprets the CSA to prohibit, like countless other federal criminal provisions, conduct that happens not to be forbidden under state law (or at least the law of the State of Oregon)." (*Gonzales v. Oregon, supra,* 546 U.S. at pp. 289–290 (dis. opn. of Scalia, J.).)

[11] The parties dispute whether obstacle preemption is merely an alternative iteration of conflict preemption, or whether obstacle preemption requires an analytical approach distinct from conflict preemption. Our Supreme Court, although recognizing that the courts have often "group[ed] conflict preemption and obstacle preemption together in a single category" (*Viva!, supra,* 41 Cal.4th at pp. 935–936, fn. 3), has concluded the two types of preemption are "analytically distinct and may rest on wholly different sources of constitutional authority [and] we treat them as separate categories . . . ." (*Ibid.*)

question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.' " (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 373 [147 L.Ed.2d 352, 120 S.Ct. 2288].)

### C. *The State Identification Card Laws and Preemption*

The parties below disputed the effect of the language of title 21 United States Code section 903, which provides: "No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, *unless there is a positive conflict* between that provision of this subchapter and that State law *so that the two cannot consistently stand together.*" (Italics added.)

In the proceedings below, State and other respondents contended this language evidenced a congressional intent to preempt only those state laws in direct and positive conflict with the CSA so that compliance with both the CSA and the state laws is impossible. Counties asserted this language was merely intended to eschew express and field preemption and should be construed as declaring Congress's intent to preempt any state laws that posed a substantial obstacle to the fulfillment of purposes underlying the CSA in addition to those in direct conflict. The trial court, after concluding title 21 United States Code section 903 was intended to preserve all state laws except insofar as compliance with both the CSA and the state statute was impossible, found the MMP and CUA were not preempted because they did not mandate conduct violating the CSA.

### *Title 21 United States Code Section 903 Limits Preemption to Positive Conflicts*

██ The intent of Congress when it enacted the CSA is the touchstone of our preemption analysis. (*Jevne v. Superior Court, supra,* 35 Cal.4th at p. 949.) When Congress legislates in a "field which the States have traditionally occupied[,] . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (*Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 67 S.Ct. 1146].) ██ Because the MMP and CUA address fields historically occupied by the states—medical practices (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485

[135 L.Ed.2d 700, 116 S.Ct. 2240]) and state criminal sanctions for drug possession (*City of Garden Grove v. Superior Court, supra*, 157 Cal.App.4th at pp. 383–386)—the presumption against preemption informs our resolution of the scope to which Congress intended the CSA to supplant state laws, and cautions us to narrowly interpret the scope of Congress's intended invalidation of state law. (*Medtronic, supra*, 518 U.S. 470.)

Our evaluation of the scope of Congress's intended preemption examines the text of the federal law as the best indicator of Congress's intent and, where that law "contains an express pre-emption clause, our 'task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.' " (*Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 62–63 [154 L.Ed.2d 466, 123 S.Ct. 518].) Because "[i]n these cases, our task is to identify the domain expressly pre-empted, [citation] . . . 'an express definition of the pre-emptive reach of a statute . . . supports a reasonable inference . . . that Congress did not intend to pre-empt other matters . . .' [citation]." (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 541 [150 L.Ed.2d 532, 121 S.Ct. 2404]; accord, *Viva!, supra*, 41 Cal.4th at pp. 944–945 [inference that express definition of preemptive reach means Congress did not intend to preempt other matters "is a simple corollary of ordinary statutory interpretation principles and in particular 'a variant of the familiar principle of *expressio unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.' "].)

 The language of title 21 United States Code section 903 expressly limits preemption to only those state laws in which there "is a *positive conflict* between [the federal and state law] *so that the two cannot consistently stand together.*" (Italics added.) When construing a statute, the courts seek to attribute significance to every word and phrase (*United States v. Menasche* (1955) 348 U.S. 528, 538–539 [99 L.Ed. 615, 75 S.Ct. 513]) in accordance with their usual and ordinary meaning. (*Strong v. State Bd. of Equalization* (2007) 155 Cal.App.4th 1182, 1193 [66 Cal.Rptr.3d 657].) The phrase "positive conflict," particularly as refined by the phrase that "the two [laws] cannot consistently stand together," suggests that Congress did not intend to supplant all laws posing some conceivable obstacle to the purposes of the CSA, but instead intended to supplant only state laws that could not be adhered to without violating the CSA. Addressing analogous express preemption clauses, the court in *Southern Blasting Services v. Wilkes County, NC, supra*, 288 F.3d 584 held the state statute was not preempted because compliance with both the state and federal laws was not impossible, and the court in *Levine v. Wyeth* (2006) 183 Vt. 76 [944 A.2d 179, 190–191] construed a federal statute with an analogous express preemption clause (which preserved state laws unless there is a direct and positive conflict) as "essentially

remov[ing] from our consideration the question of whether [state law] claims [are preempted as] an obstacle to the purposes and objectives of Congress." Because title 21 United States Code section 903 preserves state laws except where there exists such a *positive* conflict that the two laws *cannot* consistently stand together, the *implied* conflict analysis of obstacle preemption appears beyond the intended scope of title 21 United States Code section 903.

■ Counties argue this construction is too narrow, and we should construe Congress's use of the term "conflict" in 21 United States Code section 903 as signifying an intent to incorporate both positive and implied conflict principles into the scope of state laws preempted by the CSA. Certainly, the United States Supreme Court has concluded that federal legislation containing an express preemption clause and a savings clause does not necessarily preclude application of implied preemption principles. (See *Geier v. American Honda Motor Co., supra,* 529 U.S. 861; *Buckman Co. v. Plaintiffs' Legal Comm.* (2001) 531 U.S. 341 [148 L.Ed.2d 854, 121 S.Ct. 1012]; *Sprietsma v. Mercury Marine, supra,* 537 U.S. 51.) However, none of Counties' cited cases examined preemption clauses containing the "positive conflict" language included in title 21 United States Code section 903, and thus provide little guidance here.[12] Indeed, Counties' proffered construction effectively reads the term "positive" out of section 903, which transgresses the interpretative canon that we should accord meaning to every term and phrase employed by Congress. (*United States v. Menasche, supra,* 348 U.S. at pp. 538–539.) Moreover, when Congress has intended to craft an express preemption clause signifying that *both* positive and obstacle conflict preemption will invalidate state laws, Congress has so structured the express preemption clause. (See 21 U.S.C. § 350e(e)(1) [Congress declared that state requirements would be "preempted if—[¶] (A) complying with [the federal and state statutes] is not possible; or [¶] (B) the requirement of the State . . . as applied or enforced is an obstacle to accomplishing and carrying out [the federal

_____

[12] In *Geier* and *Sprietsma,* the express preemption clauses precluded a state from establishing any safety standard regarding a vehicle (*Geier*) or .vessel (*Sprietsma*) not identical to the federal standard, but separate "savings" clauses specified that compliance with the federal safety standards did not exempt any person from any liability under common law. (*Geier v. American Honda Motor Co., supra,* 529 U.S. at pp. 867–868; *Sprietsma v. Mercury Marine, supra,* 537 U.S. at pp. 58–59.) The analysis of the interplay between two statutes, as addressed by the *Geier* and *Sprietsma* courts, bears no resemblance to the issues presented here. In *Buckman Co. v. Plaintiffs' Legal Comm., supra,* 531 U.S. 341, the issues examined by the court are even more remote from the issues we must resolve. First, the *Buckman* court specifically recognized that the preemption issue there involved "[p]olicing fraud against federal agencies[, which] is hardly 'a field which the States have traditionally occupied,' [citation] such as to warrant a presumption against finding federal pre-emption of a state-law cause of action." (*Buckman,* at p. 347.) Moreover, *Buckman* effectively relied on field preemption concerns to delimit state fraud claims. (*Id.* at pp. 348–353.) Neither of these aspects of *Buckman* is relevant to the issues we must resolve.

statute]"].) Where statutes involving similar issues contain language demonstrating the Legislature knows how to express its intent, " 'the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.' " (*In re Jennings* (2004) 34 Cal.4th 254, 273 [17 Cal.Rptr.3d 645, 95 P.3d 906].)

▆▆ Because Congress provided that the CSA preempted only laws positively conflicting with the CSA so that the two sets of laws could not consistently stand together, and omitted any reference to an intent to preempt laws posing an obstacle to the CSA, we interpret title 21 United States Code section 903 as preempting only those state laws that positively conflict with the CSA so that simultaneous compliance with both sets of laws is impossible.

### The Identification Laws Do Not Positively Conflict With the CSA

Counties do not identify any provision of the CSA necessarily violated when a county complies with its obligations under the state identification laws.[13] The identification laws obligate a county only to process applications for, maintain records of, and issue cards to, those individuals entitled to claim the exemption. The CSA is entirely silent on the ability of states to provide identification cards to their citizenry, and an entity that issues identification cards does not engage in conduct banned by the CSA.

▆▆ Counties appear to argue there is a positive conflict between the identification laws and the CSA because the card issued by a county confirms that its bearer may violate or is immunized from federal laws.[14] However, the applications for the card expressly state the card will not insulate the bearer from federal laws, and the card itself does not imply the holder is immune from prosecution for federal offenses; instead, the card merely identifies those

---

[13] San Bernardino concedes on appeal that compliance with California law "may not require a violation of the CSA," although it then asserts it "encourages if not facilitates the CSA's violation." However, the *Garden Grove* court has already concluded, and we agree, that governmental entities do not incur aider and abettor liability by complying with their obligations under the MMP (*City of Garden Grove v. Superior Court, supra,* 157 Cal.App.4th at pp. 389–392), and we therefore reject San Bernardino's implicit argument that requiring a county to issue identification cards renders that county an aider and abettor to create a positive conflict with the CSA.

[14] San Diego also cites numerous subdivisions of the CUA and MMP, which contain a variety of provisions allegedly authorizing or permitting persons to engage in conduct expressly barred by the CSA, to show the CUA and MMP in positive conflict with the CSA. However, none of the cited subdivisions are contained in the statutes that Counties have standing to challenge (see fn. 8, *ante*), and we do not further consider Counties' challenges as to those provisions.

persons California has elected to exempt from California's sanctions. (Cf. *U.S. v. Cannabis Cultivators Club* (N.D.Cal. 1998) 5 F.Supp.2d 1086, 1100 [California's CUA "does not conflict with federal law because on its face it does not purport to make legal any conduct prohibited by federal law; it merely exempts certain conduct by certain persons from the California drug laws"].) Because the CSA law does not compel the states to impose criminal penalties for marijuana possession, the requirement that counties issue cards identifying those against whom California has opted not to impose criminal penalties does not positively conflict with the CSA.

Accordingly, we reject Counties' claim that positive conflict preemption invalidates the identification laws because Counties' compliance with those laws can "consistently stand together" with adherence to the provisions of the CSA.

### D. *The Identification Card Laws and Obstacle Preemption*

▮ Although we conclude title 21 United States Code section 903 signifies Congress's intent to maintain the power of states to elect "to 'serve as a laboratory' in the trial of 'novel social and economic experiments without risk to the rest of the country' " (*United States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 502 [149 L.Ed.2d 722, 121 S.Ct. 1711] (conc. opn. of Stevens, J.)) by preserving all state laws that do not positively conflict with the CSA, we also conclude the identification laws are not preempted even if Congress had intended to preempt laws posing an obstacle to the CSA. Although state laws may be preempted under obstacle preemption when the law " ' "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ' " (*Viva!, supra,* 41 Cal.4th at p. 936), not every state law posing some de minimus impediment will be preempted. To the contrary, "[d]isplacement will occur only where, as we have variously described, a '*significant conflict*' exists between an identifiable 'federal policy or interest and the [operation] of state law,' [citation] or the application of state law would 'frustrate specific objectives' . . . [citation]." (*Boyle v. United Technologies Corp.* (1988) 487 U.S. 500, 507 [101 L.Ed.2d 442, 108 S.Ct. 2510], italics added.) Indeed, *Boyle* implicitly recognized that when Congress has legislated in a field that the states have traditionally occupied, rather than in an area of unique federal concern, obstacle preemption requires an even sharper conflict with federal policy before the state statute will be invalidated. (*Ibid.*)

▮ We conclude the identification card laws do not pose a significant impediment to specific federal objectives embodied in the CSA. The purpose of the CSA is to combat recreational drug use, not to regulate a state's medical practices. (*Gonzales v. Oregon, supra,* 546 U.S. at pp. 270–272

[holding Oregon's assisted suicide law fell outside the preemptive reach of the CSA].) The identification card laws merely provide a mechanism allowing qualified California citizens, if they so elect, to obtain a form of identification that informs state law enforcement officers and others that they are medically exempted from the state's criminal sanctions for marijuana possession and use. Although California's decision to enact statutory exemptions from state criminal prosecution for such persons arguably undermines the goals of or is inconsistent with the CSA—a question we do not decide here—any alleged "obstacle" to the federal goals is presented by those California statutes that *create the exemptions*, not by the statutes providing a system for rapidly identifying exempt individuals. The identification card statutes impose no significant *added* obstacle to the purposes of the CSA not otherwise inherent in the provisions of the exemptions that Counties do not have standing to challenge, and we therefore conclude the limited provisions of the MMP that Counties *may* challenge are not preempted by principles of obstacle preemption.

We are unpersuaded by Counties' arguments that the identifications laws, standing alone, present significant obstacles to the purposes of the CSA.[15] For example, Counties assert that identification cards make it "easier for individuals to use, possess, and cultivate marijuana" in violation of federal laws, without articulating why the absence of such a card—which is entirely voluntary and not a prerequisite to the exemptions available for such underlying conduct—renders the underlying conduct significantly more difficult.

Counties also appear to assert the identification card laws present a significant obstacle to the CSA because the bearer of an identification card will not be arrested by California's law enforcement officers despite being in violation of the CSA. However, the unstated predicate of this argument is that the federal government is entitled to conscript a state's law enforcement officers into enforcing federal enactments, over the objection of that state, and this entitlement will be obstructed to the extent the identification card precludes California's law enforcement officers from arresting medical marijuana users. The argument falters on its own predicate because Congress does not have the authority to compel the states to direct their law enforcement personnel to enforce federal laws. In *Printz v. United States* (1997) 521 U.S. 898 [138 L.Ed.2d 914, 117 S.Ct. 2365], the federal Brady Act purported to compel local law enforcement officials to conduct background checks on prospective handgun purchasers. The United States Supreme Court held the

---

[15] The bulk of Counties' arguments on obstacle preemption focus on statutory provisions other than the identification card statutes. Because Counties do not have standing to challenge those statutes, we decline Counties' implicit invitation to issue an advisory opinion on whether those statutes are preempted by the CSA, and instead examine only those aspects of the statutory scheme imposing obligations on Counties.

10th Amendment to the United States Constitution deprived Congress of the authority to enact that legislation, concluding that "in [*New York v. United States* (1992) 505 U.S. 144 [120 L.Ed.2d 120, 112 S.Ct. 2408] we ruled] that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." (*Printz*, at p. 935.)[16] Accordingly, we conclude the fact that California has decided to exempt the bearer of an identification card from arrest by state law enforcement for state law violations does not invalidate the identification laws under obstacle preemption. (Cf. *Conant v. Walters, supra*, 309 F.3d at p. 646 (conc. opn. of Kozinski, J.) ["That patients may be more likely to violate federal law if the additional deterrent of state liability is removed may worry the federal government, but the proper response—according to *New York* and *Printz*—is to ratchet up the federal regulatory regime, *not* to commandeer that of the state."].)

We conclude that even if Congress intended to preempt state laws that present a significant obstacle to the CSA, the MMP identification card laws are not preempted.

V

THE AMENDMENT ISSUE

The CUA was adopted by initiative when the voters adopted Proposition 215. (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 767 [33 Cal.Rptr.3d 859].) Article II, section 10, subdivision (c) of the California Constitution

---

[16] San Diego argues the anticommandeering doctrine discussed in *Printz* is inapplicable because the court in *Hodel v. Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 289–290 [69 L.Ed.2d 1, 101 S.Ct. 2352] explicitly rejected the assertion the Tenth Amendment delimited Congress's ability under the commerce clause to displace state laws. However, *Printz* rejected an analogous claim when it held that, although the commerce clause authorized Congress to *enact* legislation concerning handgun registration, the Brady Act's *direction of the actions of state executive officials* was not constitutionally valid under United States Constitution, article I, section 8, as a law "necessary and proper" to the execution of Congress's commerce clause power to regulate handgun sales, because when "a 'La[w] . . . for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions we mentioned earlier [citation] it is not a 'La[w] . . . *proper* for carrying into Execution the Commerce Clause.' " (*Printz, supra*, 521 U.S. at pp. 923–924.) Thus, although the commerce clause permits Congress to *enact* the CSA, it does not permit Congress to *conscript state officers* into arresting persons for violating the CSA.

provides the Legislature may "amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." San Bernardino asserts on appeal that the identification laws, which are among the statutes adopted by the Legislature without voter approval when it enacted the MMP, are invalid because they amend the CUA.

This issue, although not pleaded in the complaints filed by either San Bernardino or San Diego, was initially raised by County of Merced's (Merced) complaint in intervention. State argues on appeal that because Merced has not appealed, and only Merced formally pleaded the article II, section 10, subdivision (c), issue, we may not on appeal consider San Bernardino's arguments as to this issue. During oral arguments on the motions for judgment on the pleadings, San Bernardino adopted and joined in Merced's arguments, without objection by State that the arguments were beyond the scope of San Bernardino's pleadings. Additionally, the trial court's judgment, after noting that one of the issues raised by Merced and joined in by San Bernardino was the article II, section 10, subdivision (c), issue, specifically noted in its judgment that "[a]t oral argument, each party agreed that all plaintiffs win or lose together," and thereafter ruled on the article II, section 10, subdivision (c) issue. Under these circumstances, we conclude that because (1) the parties litigated the matter below on the understanding that San Diego and San Bernardino were properly asserting the additional ground of invalidity raised by Merced, and (2) the trial court's judgment against San Bernardino included a rejection of all of the arguments raised by all coplaintiffs, San Bernardino may litigate this issue on appeal. (See, e.g., *Jones v. Dutra Construction Co.* (1997) 57 Cal.App.4th 871, 876–877 [67 Cal.Rptr.2d 411].)

■ Although legislative acts are entitled to a strong presumption of constitutionality, the Legislature cannot amend an initiative, including the CUA, unless the initiative grants the Legislature authority to do so. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251–1253 [48 Cal.Rptr.2d 12, 906 P.2d 1112].) Because the CUA did not grant the Legislature the authority to amend it without voter approval, and the identification laws were enacted without voter approval, those laws are invalid if they *amend* the CUA within the meaning of article II, section 10, subdivision (c) of the California Constitution.

■ The proscription embodied in article II, section 10, subdivision (c) of the California Constitution is designed to " 'protect the people's initiative

powers by precluding the Legislature from undoing what the people have done, without the electorate's consent.'" (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1484 [76 Cal.Rptr.2d 342].) "[L]egislative enactments related to the subject of an initiative statute may be allowed" when they involve a "related but distinct area" (*Mobilepark West Homeowners Assn. v. Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 43 [41 Cal.Rptr.2d 393]) or relate to a subject of the initiative that the initiative "does not specifically authorize *or* prohibit." (*People v. Cooper* (2002) 27 Cal.4th 38, 47 [115 Cal.Rptr.2d 219, 37 P.3d 403].)

■ The identification laws do not improperly amend the provisions of the CUA.[17] The MMP's identification card system, by specifying participation in that system is voluntary and a person may "claim the protections of [the CUA]" without possessing a card (§ 11362.71, subd. (f)), demonstrates the MMP's identification card system is a discrete set of laws designed to confer distinct protections under California law that the CUA does *not* provide without limiting the protections the CUA *does* provide. For example, unlike the CUA, which did not immunize medical marijuana users from arrest but instead provided a limited "immunity" defense to prosecution under state law for cultivation or possession of marijuana (see *People v. Mower* (2002) 28 Cal.4th 457, 468–469 [122 Cal.Rptr.2d 326, 49 P.3d 1067]), the MMP's identification card system is designed to protect against unnecessary arrest. (See § 11362.78 [law enforcement officer must accept the identification card absent reasonable cause to believe card was obtained or is being used fraudulently].) Additionally, the MMP exempts the bearer of an identification card (as well as qualified patients as defined by the MMP) from liability for other controlled substance offenses not expressly made available to medical marijuana users under the CUA. (Compare § 11362.5, subd. (d) [§§ 11357 and 11358 do not apply to patient or primary caregiver if substance possessed or cultivated for personal medical purposes] with § 11362.765, subd. (a) [specified persons not subject to criminal liability for §§ 11359, 11360, 11366.5 or 11570 in addition to providing exemptions from §§ 11357 and 11358, which parallel the CUA's exemption].)

---

[17] We recognize the Second District Court of Appeal has concluded that one statute enacted as part of the MMP—section 11362.77, subdivision (a) (establishing a ceiling on the amount of marijuana a qualified patient or primary caregiver may possess)—was an improper amendment of the CUA. (See *People v. Kelly* (2008) 163 Cal.App.4th 124 [77 Cal.Rptr.3d 390].) Although it is unclear either that the *Kelly* court was required to reach the issue or that its resolution of the issue was correct, *Kelly* did not purport to hold the entire MMP invalid but instead severed the quantity limitations of section 11362.77, subdivision (a) from the balance of the MMP and determined only that the severed aspect of the MMP was an unconstitutional amendment of the CUA. Because we here address different aspects of the MMP from that considered in *Kelly*, the conclusion in *Kelly* is inapposite to our task.

Counties, relying on *Franchise Tax Board v. Cory* (1978) 80 Cal.App.3d 772 [145 Cal.Rptr. 819],[18] assert that any legislation that adds provisions to an initiative statute, for purposes of either correcting it or clarifying it, is amendatory within the proscriptions of article II, section 10, subdivision (c).[19] However, in *Franchise Tax Board,* the court invalidated the legislative enactment because the initiative statute required audits of financial reports of candidates for public office, and the legislative enactment both added to the audit requirements of the initiative statute (by specifying the standards to be employed by the audit) and by "significantly restricting the manner in which audits are to be conducted." (*Franchise Tax Board v. Cory, supra,* 80 Cal.App.3d at p. 777.)

Here, although the legislation that enacted the MMP added statutes regarding California's treatment of those who use medical marijuana or who aid such users, it did not add statutes or standards *to the CUA.* Instead, the MMP's identification card is a part of a separate legislative scheme providing separate protections for persons engaged in the medical marijuana programs, and the MMP carefully declared that the protections provided by the CUA were preserved without the necessity of complying with the identification card provisions. (§ 11362.71, subd. (f).) The MMP, in effect, amended provisions of the Health and Safety Code regarding regulation of drugs adopted by the Legislature, not provisions of the CUA. Because the MMP's identification card program has no impact on the protections provided by the CUA, we reject Counties' claim that those provisions are invalidated by article II, section 10, subdivision (c) of the California Constitution.

---

[18] San Bernardino appears to rely on *Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187 [219 Cal.Rptr. 664] for the proposition that legislative action constitutes an amendment of a prior initiative statute in violation of article II, section 10, subdivision (c), of the California Constitution if its purpose is to clarify or correct uncertainties in existing law. However, the *Planned Parenthood Affiliates* court evaluated whether the legislation under consideration violated the single subject rule of article IV, section 9 of the California Constitution, and had no occasion to consider whether the statute was invalid under article II, section 10, subdivision (c).

[19] San Bernardino also quotes, without citation to the record, certain statements of legislative intent allegedly declaring the intent of the MMP was to "clarify the scope" of the CUA and "address issues that were not included in the [CUA]." Even were we to consider this argument (but see *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826–827, fn. 1 [19 Cal.Rptr.3d 84] [failure of party to cite record permits appellate court to disregard matter]), it ignores that other legislative history accompanying adoption of the MMP specified "[n]othing in [the MMP] shall amend or change Proposition 215, nor prevent patients from providing a defense under Proposition 215 . . . . *The limits set forth in [the MMP] only serve to provide immunity from arrest for patients taking part in the voluntary ID card program, they do not change Section 11362.5 (Proposition 215).*" (Sen. Rules Com., Off. of Sen. Floor Analyses, com. on Sen. Bill No. 420 (2003–2004 Reg. Sess.) as amended Sept. 9, 2003.) Thus, the legislative history suggests the MMP was *not* intended to alter or affect the rights provided by the CUA.

## DISPOSITION

The judgment is affirmed.

O'Rourke, J., and Irion, J., concurred.

The petitions of all appellants for review by the Supreme Court were denied October 16, 2008, S166505.