Filed 4/1/16; part. pub. order 4/21/16 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JESSICA L. BROOKS, | D067491 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00097107-CU-BC-CTL) |
| CARMAX AUTO SUPERSTORES CALIFORNIA, LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge. Affirmed.

Rosner, Barry & Babbitt, Hallen D. Rosner and Kendra J. Woods for Plaintiff and Appellant.

Schlichter & Shonack, Kurt A. Schlichter, Steven C. Shonack and Jamie L. Keeton for Defendant and Respondent.

Defendant CarMax Auto Superstores California LLC (CarMax) advertises and sells cars as "certified" used vehicles. It sold a certain 2008 used Jeep Wrangler (the Jeep) to plaintiff Jessica Brooks. CarMax had promoted the Jeep as a certified used

vehicle, inspected the Jeep, conducted some repairs, and ultimately placed a signed Certified Quality Inspection document (the CQI Certificate) for the Jeep in the Jeep's glove box. The CQI Certificate remained in the glove box at all relevant times.

Several months after Brooks purchased the Jeep, she drove it through a deep puddle and the engine was so severely damaged that it had to be replaced. She thereafter demanded (among other things) that CarMax rescind the purchase agreement and buy the Jeep back. When CarMax rejected her demands, she filed this action alleging it violated Vehicle Code section 11713.18 (section 11713.18) in connection with her purchase of the Jeep, because neither the content of the CQI Certificate nor its method of delivery to her complied with CarMax's duties under section 11713.18. Brooks pleaded claims against CarMax under California's Consumer's Legal Remedies Act (Civ. Code, § 1750 et seq. (CLRA)) and Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)).

After a court trial on stipulated facts, the court ruled Brooks had suffered no damage from CarMax's alleged violations of section 11713.18, and therefore concluded she did not have standing to pursue claims under the CLRA or the UCL. The court entered judgment for CarMax. Brooks asserts on appeal that reversal is required because she adequately demonstrated the type of damage necessary to prosecute a claim under the CLRA or the UCL or, alternatively, she was entitled to prosecute her claims under the CLRA or the UCL without showing any injury.

# I

## BACKGROUND

A. <u>Factual Context</u>[1]

CarMax advertises and sells cars as "certified" used vehicles. Brooks was searching for a used vehicle and, on November 11, 2011, she bought the Jeep, which was a "certified" used vehicle, from CarMax. She would not have purchased the Jeep had it not been a "certified" vehicle.

CarMax performs a Certified Quality Inspection (CQI) on every vehicle it sells to consumers, and performed that inspection on the Jeep. CarMax expended at least 15.7 man hours and over $1,000 in conducting the CQI for the Jeep, not including the additional time spent on repairs it sublet to other shops. When CarMax technicians conduct a CQI, the technicians use a document (the CQI/VQI checklist) that lists components and observations concerning the vehicle, and information from the CQI/VQI checklist is entered into CarMax vehicle repair order history database, but the physical CQI/VQI checklist is not retained by CarMax. Upon completion of the CQI, a signed CQI Certificate is placed into the glove box of the inspected vehicle. The signed CQI

---

1    Our factual statement reviews the facts most favorably in support of the judgment because, although this case was tried on stipulated facts, we nevertheless must review the court's findings under the substantial evidence standard of review when, as here, the court makes additional inferences based on those stipulated facts. (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.* (2012) 204 Cal.App.4th 1214, 1222.) Our review must view the evidence most favorably to the prevailing party, including both express and implied findings of fact made by the court in its statement of decision rendered after a nonjury trial. (See, e.g., *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461-462.)

Certificate for the Jeep, which listed the Jeep's stock number, was placed in its glove box at the time the inspection was completed and remained in the glove box until after Brooks purchased the Jeep.

Brooks drove the Jeep for over 3000 miles without any problems. However, on February 11, 2012, she drove it through a 6" to 12" deep puddle and the engine seized. She used a third party repair shop to replace the engine, but the Jeep thereafter had occasional problems with the starter and with warning light activations.

Brooks demanded (among other things) that CarMax rescind the purchase agreement and buy the Jeep back. When it rejected her demands, she filed this action alleging CarMax violated section 11713.18 in connection with her purchase of the Jeep, because neither the content of the CQI Certificate nor its method of delivery to her complied with CarMax's obligations under section 11713.18.

B. Contentions and Ruling Below

Brooks argued CarMax violated the mandates of section 11713.18: (1) the *content* of the CQI Certificate was inadequate because it failed to " 'indicat[e] all components inspected,' " and (2) the *placement* of the CQI Certificate in the Jeep's glove compartment did not comply with CarMax duty to provide it " 'prior to sale.' " She asserted those violations of section 11713.18 were adequate to support her claims under the CLRA and UCL. The court concluded that, even assuming the content or mode of delivery of the CQI Certificate did not strictly comply with section 11713.18, Brooks did not have standing to pursue claims under the CLRA and UCL for noncompliance unless she also showed she suffered some tangible injury from noncompliance, and there was no

4

evidence she was actually damaged by either the content of CarMax's CQI Certificate or by the mode it was delivered to her. The court noted it was undisputed the Jeep was actually inspected pursuant to the terms of CarMax's used vehicle certification program, and a certificate memorializing its compliance with the terms of that program was issued by CarMax. The court reasoned that because this was the product Brooks wanted to purchase and actually received on November 11, 2011, the fact the paperwork memorializing CarMax's certification (i.e. the CQI Certificate) was "provided" to her in her glove box (rather than in some other fashion) caused no actual injury to her.

II

STANDARD OF REVIEW

There are two distinct standards of review applicable to our resolution of Brooks's claims in this appeal. Because this case was tried on stipulated facts, the stipulated facts are conclusive and may not be contradicted. (*Linsk v. Linsk* (1969) 70 Cal.2d 272, 276.) However, because the trial court made inferences based on those stipulated facts, we must review those additional factual findings based on those inferences under the substantial evidence standard of review. (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd., supra,* 204 Cal.App.4th at p. 1222.) Our review of these additional factual findings " ' " 'begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" ' " (*Ibid.*)

When reviewing the trial court's legal conclusions, including its construction of a statutory scheme, we apply de novo review. (*Penner v. County of Santa Barbara* (1995)

5

37 Cal.App.4th 1672, 1676; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)  "In construing statutes, our goal is to ascertain the intent of the Legislature in order to effectuate the law's purpose." (*Martinez v. Kia Motors America, Inc.* (2011) 193 Cal.App.4th 187, 192.)  We begin with the words of the statute and "give them 'their usual and ordinary meaning.' [Citation.] 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387-388.)[2]

On appeal, we must affirm the judgment if it is correct on any theory, even if the trial court's reasoning was erroneous (*Muller v. Fresno Community Hospital & Medical Center* (2009) 172 Cal.App.4th 887, 906-907) because " 'we review the trial court's result for error, and not its legal reasoning.' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 478.)  Even if the statement of decision reveals the legal basis for the ruling was incorrect, we "cannot undo the effect of the ruling or the ensuing judgment on the ground

---

2      CarMax has requested that we take judicial notice of certain legislative history surrounding the bill that ultimately enacted section 11713.18, along with numerous decisions by federal trial judges addressing claims analogous to the claims raised by Brooks in this action.  We grant the motion insofar as it asks this court to take judicial notice of the legislative history appended to CarMax's motion (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31) but deny the motion insofar as it requests that we take judicial notice of nonbinding federal trial court decisions.  (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 418.)

6

that the court may have misapplied [the law] as long as any other correct legal reason exists to sustain [the judgment]." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981.)

III

ANALYSIS

A. <u>Brooks's Claims Under *Kwikset*</u> [3]

Brooks argues the court erred in ruling she did not have standing to pursue her claims based on the trial court's finding she suffered no injury from the alleged violations. Her first specification of error, apparently raised for the first time on appeal, is that the absence of injury is *irrelevant* to her standing to pursue her claims under the CLRA and UCL. Instead, she argues the Legislature intended a violation of section 11713.18 would be actionable under the CLRA and the UCL even without any showing of actual injury from the alleged violation.

Brooks alternatively argues that, under the rationale of *Kwikset*, she adequately demonstrated actual injury. She asserts she would not have purchased the Jeep had it not qualified as a "certified" vehicle, regardless of whether the Jeep was as mechanically sound as a Jeep that *did* qualify as a "certified" vehicle. She argues no vehicle can qualify as a "certified" vehicle under section 11713.18, subdivision (a), regardless of whether it was actually inspected and approved by CarMax under its inspection program, unless (among other things) the vendor provides the buyer with a "completed inspection report indicating all the components inspected," and "provides" that report "prior to sale."

---

[3]      *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310 (*Kwikset*).

She asserts (1) the CQI Certificate provided by CarMax in connection with her purchase does *not* satisfy the statutory mandate of a "completed inspection report indicating all the components inspected," and (2) CarMax did *not* "provide" that report "prior to sale." Because Brooks contends the content of the CQI Certificate did not satisfy the statutory mandate, and (even assuming its content was adequate) the mode of delivery of the CQI Certificate did not satisfy the statutory mandate, the Jeep did not qualify to be labeled as a "certified" vehicle (even if its intrinsic mechanical condition was equivalent to a "certified" vehicle), and therefore she suffered actual injury within the rationale of *Kwikset* by purchasing something that was mislabeled. Because these arguments rest on *Kwikset,* we summarize that case and its holdings.

In *Kwikset*, the plaintiffs alleged Kwikset falsely marketed and sold locksets labeled as "Made in U.S.A.," arguing the locksets were mislabeled because they in fact contained foreign-made parts or involved foreign manufacture. The appellate court, evaluating the newly adopted requirements of Proposition 64 depriving a plaintiff of standing to bring a UCL claim absent actual injury, concluded the plaintiffs had not alleged any loss of money or property because they received locksets in return that were neither overpriced nor defective and therefore did not have standing to bring a UCL claim. (*Kwikset, supra,* 51 Cal.4th at p. 319.) The Supreme Court, after recognizing that "the core" of the appellate court's ruling was that "plaintiffs should not be accorded standing because they received the benefit of their bargain . . . [by] receiv[ing] a fully functioning product . . . even if the product label contains misrepresentations that may have been relied upon by a particular class of consumers" (*id.* at p. 332), rejected the

8

Court of Appeal's conclusion there was an absence of economic injury. Instead, the Supreme Court reasoned, in the context of labels designed to induce a consumer to select among competing products, "labels matter." (*Id*. at p. 328.) *Kwikset* noted standing requires that a party "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e. *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (*Id*. at p. 322.) The *Kwikset* court reasoned that when a consumer alleges purchase of a product based on the information imparted by its label, and the information was false, and he or she would not have purchased it absent that misrepresentation, the consumer has satisfied the "actual injury" requirements for standing even if the product he or she actually obtained was functionally equivalent to the product the consumer thought he or she was buying. (*Id*. at pp. 332-337.) Against this background, we turn to Brooks's claims.

B. <u>A Violation of Section 11713.18 Is Not "Per Se" Actionable Under the CLRA or the UCL</u>

Brooks first claims a violation of section 11713.18 is "per se" actionable under the CLRA and UCL, regardless of any injury. Section 11713.18, subdivision (b), provides that "[a] violation of [section 11713.18] is actionable under [the CLRA], [the UCL] . . . or any other applicable state or federal law. The rights and remedies provided by [section 11713.18] are cumulative and shall not be construed as restricting any right or remedy that is otherwise available." Brooks contends the trial court's conclusion she lacked standing to pursue her claims under the CLRA and UCL was error because the text of

9

section 11713.18 shows it was intended to make actionable any violation of that section without any showing the plaintiff was actually injured from the alleged violation.

Ordinarily, "under the CLRA, relief is limited to consumers who have suffered, in fact, damage as a result of an illegal practice." (*Davis-Miller v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 106, 122.) Similarly, although the UCL did not predicate standing on a showing of injury or damage prior to the 2004 enactment of Proposition 64, that lacuna rendered the UCL "subject to abuse by attorneys who used it as the basis for legal ' "shakedown" ' schemes" (*Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 812, disapproved on other grounds in *Kwikset, supra,* 51 Cal.4th at p. 337) and frivolous lawsuits (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228). "To address this problem, Proposition 64 amended [the UCL] to accord standing only to certain specified public officials and to any person who ' " 'has suffered injury in fact and has lost money or property as a result of such unfair competition.' " ' " (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1590, quoting *Buckland,* at p. 812.) "Thus, in the aftermath of Proposition 64, only plaintiffs who have suffered actual damage may pursue a private UCL action." (*Ibid.*)

Brooks argues that section 11713.18, subdivision (b), by providing that a violation of section 11713.18 "is actionable under [the CLRA or the UCL]," was intended to exempt her from showing the "actual injury" predicate ordinarily necessary to making a claim "actionable" under the CLRA and the UCL. She cites no pertinent authority for this reading of section 11713.18, subdivision (b), and instead relies solely on *Rojas v. Platinum Auto Group, Inc.* (2013) 212 Cal.App.4th 997 (*Rojas*). Although *Rojas* did

10

conclude a specific remedy provided under the so-called Rees–Levering Act (Civ. Code, § 2981 et seq.) could be invoked even if the plaintiff suffered no actual harm (*Rojas,* at p. 1005), it did *not* hold the CLRA and UCL claims asserted by the plaintiff in that action (*id*. at p. 1006) could *also* be pursued without actual injury.[4]  Moreover, *Rojas's* conclusion rested on two important factors not present here.  First, *Rojas* examined a statutory scheme that included an express additional statutory remedy for its violation,[5] and no similar additional remedy is expressly appended to section 11713.18.  (Cf. *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 825 ["Where statutes involving similar issues contain language demonstrating the Legislature knows how to express its intent, ' "the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' "]  Moreover, *Rojas's* conclusion as to the intent of the express statutory remedy was confirmed by the clear legislative history declaring the Legislature *intended* the remedy provided by the Rees–Levering Act to be available " 'regardless of the nature of the disclosure violation *or any consumer harm*' " (*Rojas,*

---

[4]     To the contrary, in *Rojas*, the plaintiff pleaded causes of action for violation of the CLRA and UCL and on appeal the court ordered demurrers to those claims be sustained, albeit with leave to amend.  (*Rojas, supra*, 212 Cal.App.4th at p. 1006.)

[5]     The statute provided that, if the seller violated certain disclosure requirements, "the conditional sale contract shall not be enforceable . . . until after the violation is corrected as provided in Section 2984, and, if the violation is not corrected, the buyer may recover from the seller the total amount paid . . . by the buyer . . . ."  (Civ. Code, § 2983, subd. (a).)  Thus, the Rees–Levering Act contained an internal remedy (i.e., declaring the contract unenforceable) absent from section 11713.18.

11

*supra,* 212 Cal.App.4th at p. 1005), and no similar language can be found in the legislative history accompanying section 11713.18.

There is no basis for concluding section 11713.18, subdivision (b), by providing that a violation of section 11713.18 is "actionable" under the CLRA or the UCL, was intended to dispense with the "actual injury" predicate ordinarily necessary before a claim for a violation of that section can be "actionable" by a private party under the CLRA and the UCL. We must evaluate whether Brooks's claims were viable under principles generally applicable to claims under the CLRA and the UCL.

C. The "Content of the CQI Certificate" Claim

Brooks's principal contentions seek to bring her action under the ambit of *Kwikset*. Her first contention is that section 11713.18, subdivision (a)(6), requires a "completed inspection report indicating all the components inspected" in order to label the vehicle as "certified," and she claims that document effectively was *never* provided because the CQI Certificate provided by CarMax to Brooks does not satisfy this statutory requirement and was therefore a nullity. Because this violation of section 11713.18, subdivision (a), precluded CarMax from promoting or selling the Jeep as a "certified" vehicle, Brooks argues her action falls within the ambit of *Kwikset*.

We agree with Brooks that the legislative scheme contemplates certain minimal standards must be met before a dealer may promote or sell a vehicle as certified, among which is that a dealer must provide a "completed inspection report indicating all the components inspected" to the buyer. We also agree that, if those standards are *not* satisfied, a vehicle marketed and sold as certified has been mislabeled, and a buyer who

12

establishes they would not have purchased the vehicle absent that "certified" label has standing to pursue claims for violation of the CLRA and UCL under the rationale of *Kwikset*, regardless of whether the particular vehicle purchased might be as mechanically sound or intrinsically valuable as a certified vehicle.

However, we conclude the trial court correctly entered judgment against Brooks (*Rappleyea v. Campbell, supra,* 8 Cal.4th at p. 981) because we reject Brooks's claim that the CQI Certificate was deficient in its content. The plain language of the statute requires only a "report indicating all the components inspected," and we conclude CarMax's CQI Certificate *does* satisfy the minimal obligations imposed by section 11713.18, subdivision (a)(6). We begin by noting that our role in statutory construction starts with the words of the statute, "because they generally provide the most reliable indicator of legislative intent." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871.) A court " 'may not provide words or language which are not found in a statute in order to accommodate a litigant' " (*Mocek v. Alfa Leisure, Inc.* (2003) 114 Cal.App.4th 402, 408), and "our own views concerning the theoretical desirability or value of such [language is] beside the point. In construing this, or any, statute, our office is simply to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does. We may not rewrite the statute to conform to an assumed intention that does not appear in its language." (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253.)

We find it significant that the statutory language employed by section 11713.18, subdivision (a)(6), imposes no minimum *amount* of inspection a dealer must perform

13

before a vehicle may be labeled as a "certified" vehicle,[6] other than perhaps such inspection as can be implied from subdivisions (a)(1) through (a)(6), thus leaving to each dealer the election of conducting either a more rigorous inspection or a less rigorous inspection. We construe the requirement imposed by section 11713.18, subdivision (a)(6)—of providing a buyer with a report listing "all the components inspected"—as intended to provide the buyer with a report illuminating the relative rigorousness of the inspection the dealer has elected to conduct, and nothing more. We believe CarMax's CQI Certificate satisfies that obligation, because it indicates the scope of the inspection program CarMax has elected to perform (by stating the program "check[s] over 125 points including (but not limited to)" the items listed on CarMax's CQI Certificate) and certifies the vehicle "passed" the inspection program used by CarMax.

We are unpersuaded by Brooks's arguments that section 11713.18, subdivision (a)(6), requires "something more" than is provided by CarMax's CQI Certificate. For example, Brooks contended below that the actual *results* of the inspection, such as the CQI/VQI checklist used by CarMax technicians that lists the order in which the various parts and systems are to be inspected and notates their observations concerning the specific vehicle, would be *necessary* to satisfy the "report" requirement imposed by section 11713.18, subdivision (a)(6). Although the CQI/VQI checklist certainly *would*

---

6      Indeed, the statute does not facially impose any explicit obligation for a dealer even to *repair* any problems revealed by the inspection the dealer elects to perform.

14

satisfy the "report" requirement, we cannot conclude the CQI/VQI checklist is the *minimum* required to satisfy section 11713.18, subdivision (a)(6).

Although the legislative history provides little insight into the precise claims asserted by Brooks, we have taken judicial notice of documents (see fn. 2, *ante*) showing that, as originally written, section 11713.18, subdivision (a)(6) provided "[p]rior to sale, the dealer provides the buyer with a completed inspection report indicating all the components inspected *pursuant to the vehicle certification program and certifies that all of the inspected components meet the express written standards of the vehicle certification program*." (Assem. Bill No. 68 (2005-2006 Reg. Sess.) as introduced Jan. 3, 2005, § 7.) However, both the "pursuant to the vehicle certification program" language and the "certifies that all the inspected components meet the express written standards of the vehicle certification program" language was deleted from the enactment, which deletion is persuasive that the enactment " 'should not be interpreted to include what was left out.' " (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1107.) Thus, the Legislature originally contemplated requiring *more* than a report "indicating all components inspected," both by language that would have tied that report to the entirety of the dealer's inspection program (i.e. by requiring the report to indicate "all the components inspected *pursuant to the vehicle certification program"*) and by language that would have required the report to guarantee the postinspection condition of these components (by requiring the report "*certif*[*y*] *that all the inspected components meet the express written standards of the vehicle certification program*"). The deletion of those clauses suggests the Legislature did not intend to impose either requirement, but Brooks's

15

construction of the language would resurrect these clauses by mandating that everything actually inspected by the dealer during the dealer's certification program be listed on the report.

Brooks also suggests the requirement for a report "indicating all the components inspected" renders CarMax's CQI Certificate inadequate because the CQI Certificate lists only "125 points" when in fact *more* than the listed 125 points were inspected. We reject her claim, for two reasons. First, the CQI Certificate states CarMax "check[s] *over* 125 points *including* (*but not limited to*)" the 125 specifically listed items (italics added), and therefore the CQI Certificate is an accurate portrayal of the inspection CarMax chose to conduct. More importantly, Brooks's claim under *Kwikset* rests not on the precise parameters of CarMax's inspection, but instead rests solely on whether the Jeep was qualified to carry the label of "certified." Her argument contains the unstated predicate that, had CarMax conducted its inspection of *only* the 125 points described in the CQI Certificate *and immediately ceased inspecting the Jeep once those 125 points had been inspected*, CarMax would at that moment have been entitled to append the label "certified" to the Jeep and would have been free from any liability under section 11713.18 or under *Kwikset*. However, Brooks's construction of section 11713.18 posits that, once CarMax conducted *any* additional inspection, the right to append the label "certified" to the Jeep evaporated and CarMax would become exposed to liability under section 11713.18. We decline to adopt her interpretation of section 11713.18 because we cannot ascribe to the Legislature the intent that a consumer protection statute would protect a dealer who limits its inspection to the minimal amount required but

16

concomitantly exposes to liability a dealer who "goes the extra mile" when inspecting a vehicle. (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [" ' "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend" ' "].) We are convinced Brooks's interpretation of this consumer protection statute—as penalizing businesses that do more to protect a consumer while protecting businesses that do less to protect a consumer—is an " ' "absurd consequence[] which the Legislature did not intend." ' " (*Ibid*.)

    D. The "Mode of Delivery" Claim

    Brooks alternatively asserts that, even assuming the content of the CQI Certificate satisfied section 11713.18, subdivision (a)(6), CarMax's chosen mode of delivering that document to Brooks—placing it in the glove box of the Jeep after the inspection was completed—violated section 11713.18, subdivision (a)(6). Specifically, the statute states it is a violation of section 11713.18 to sell a vehicle as "certified" if the dealer fails "[p]rior to sale . . . to provide the buyer with [the CQI Certificate]." (*Id*., subd. (a)(6).) Brooks argues that, because she did not *discover* the certificate until weeks after she had purchased the Jeep, CarMax violated the statute even though it placed the CQI Certificate in the glove box of the Jeep once the inspection had been completed and it remained there until found by Brooks.[7]

---

7    Although we noted Brooks's claim of actual injury under *Kwikset* would have been tenable had CarMax been precluded from labeling the Jeep as "certified" because CarMax's CQI Certificate was too deficient in its content to qualify as a "report" for

17

The statute does not regulate the precise manner in which this obligation must be discharged, and we must therefore determine whether the mode chosen by CarMax comports with the meaning of the statute. In discerning the scope and meaning of that provision, " '[w]e begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) When interpreting statutory language according to the usual, ordinary import of the language employed by the Legislature, we may "start with the words themselves" as defined by the dictionary. (*People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 43; *People v. Whitlock* (2003) 113 Cal.App.4th 456, 462 [when interpreting a statute, "[t]o ascertain the common meaning of a word, 'a court typically looks to dictionaries' "].)

---

purposes of section 11713.18, subdivision (a)(6), we are substantially less certain about the tenability of her *Kwikset* argument of actual injury based on her "mode of delivery" claim. *Kwikset* is distinguishable because the product there could *never* have qualified for the label "Made in America," and the injury was that the plaintiff relied on that label to choose to purchase the Kwikset lockset rather than a different lockset. In contrast, under Brooks's argument, the Jeep *did* qualify to be *advertised* with the "certified" label (because it had not yet been sold without providing the report), and it was *this* representation on which she detrimentally relied in her decision-making process. Indeed, under her argument, the "certified" label remained accurate until the moment the Jeep was sold because (up until that moment) CarMax had not yet defaulted on the obligation Brooks claims CarMax owed, and therefore the Jeep was mislabeled *because* it was sold with the CQI Certificate in the glove compartment. Although we need not evaluate this conundrum because of our conclusion CarMax adequately "provided" the report prior to sale, it appears *Kwikset's* analysis of actual injury creates logical difficulties when extended to Brooks's "mode of delivery" claim.

18

We believe the key to construing CarMax's obligation under section 11713.18, subdivision (a)(6), is the verb "provide."[8] The verb "provide," as defined by various dictionaries, is "1. to make available; furnish . . . 2. to supply or equip" (Random House Dict. (2d ed. 1987) (1987) p. 1556), or "1. To furnish; supply . . . 3. to make available; afford" (American Heritage Dict. (2d college ed. 1985) p. 997), or similar usages. The statute thus contemplates that a dealer satisfies its obligation under section 11713.18, subdivision (a)(6), as long as the dealer has *made available* or furnished the requisite report to the buyer sometime before the sale. The evidence that the CQI Certificate was placed in the glove box at the conclusion of CarMax's inspection and was still there weeks after Brooks purchased the Jeep permits the inference (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd., supra,* 204 Cal.App.4th at p. 1222) that the CQI Certificate was in the Jeep when she arrived at CarMax's San Diego lot, and remained there as she considered

---

[8]     Brooks's appellate argument focuses solely on the clause "prior to sale" and rhetorically asks, "Is there really any doubt that 'prior to sale' means before a consumer signs [his or her] sales contract?" We agree the clause admits of little ambiguity because it specifies the required conduct occur before the "sale," although it does not impose any minimum temporal separation between the required conduct and the "sale." However, her claim—that there can be no doubt it means the CQI Certificate must be provided "before the sales contract is signed"—is at least murky. Certainly, the Legislature showed (in the same bill that enacted § 11713.18, subd. (a)(6)) that it was fully capable of expressing such a temporal relationship to execution of a sales contract when that was its intent (see, e.g., Civ. Code, § 2982, subd. (h) [requiring conditional sales contract to include language advising buyer, "After this contract is signed, the seller may not change the financing"]), which militates against Brooks's claim that the language "prior to sale" clearly was intended to signify "prior to signing the sales contract." (Cf. *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 825 ["Where statutes involving similar issues contain language demonstrating the Legislature knows how to express its intent, ' "the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' "].)

whether to purchase the Jeep.  Although she may have conducted only a cursory examination of the Jeep before deciding to buy it, and therefore ignored the paperwork contained in the vehicle that was "available" to her, this did not detract from the fact that CarMax *did* "make available" the CQI Certificate to Brooks "prior to sale" of the Jeep.

E. Conclusion

Although the trial court premised its judgment on Brooks's lack of actual injury, we affirm the judgment as correct (*Rappleyea v. Campbell, supra,* 8 Cal.4th at p. 981) because we conclude both the content of the CQI Certificate and the mode it was provided to Brooks satisfied the requirements of section 11713.18, subdivision (a)(6).

DISPOSITION

The judgment is affirmed.  CarMax is entitled to costs on appeal.


McDONALD, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.


20

Filed 4/21/16

CERTIFIED FOR PARTIAL PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JESSICA L. BROOKS, | D067491 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00097107-CU-BC-CTL) |
| CARMAX AUTO SUPERSTORES CALIFORNIA, LLC, | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| Defendant and Respondent. | |


THE COURT:

The opinion in this case filed April 1, 2016, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED, with the exception of Part III.A.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports, with the exception of Part III.A.

HUFFMAN, Acting P. J.

Copies to:  All parties